IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>   vs.<br><br>MYLON MAYFIELD,<br><br>             Defendant. | 8:19CR272<br><br>FINDINGS AND RECOMMENDATION |

      This matter is before the Court on the Motion to Suppress and Request for Evidentiary Hearing and Oral Argument (Filing No. 18) filed by Defendant, Mylon Mayfield. Defendant filed a brief in support of the motion (Filing No. 19) and the government filed a brief in opposition (Filing No. 21).

      The Court held an evidentiary hearing on the motion on October 23, 2019. Defendant was present with his attorney, Michael Hansen. The government was represented by Assistant United States Attorney, Matt Lierman. Omaha Police Department officers Jared Grayson and Jason Friedrichsen testified on behalf of the government. The Court received into evidence Exhibits 1 through 6 offered by the government and took judicial notice of Neb. Rev. Stat. § 28-901 (obstructing government operations) and Omaha Municipal Code § 20-251 (requiring registration of firearms). A transcript (TR.) of the hearing was prepared and filed on November 12, 2019. (Filing No. 28). This matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge recommends that Defendant's motion be denied.

## BACKGROUND

      On July 15, 2019, at 10:41 p.m., Officer Grayson and Officer Jason Barnes received a call from dispatch for shots fired near the Spencer Housing Projects in the area of 28th Street and Spencer Street in Omaha, Nebraska. A 911-caller stated a shirtless black male wearing black pants had shot at a female and it was unknown if anyone was injured, which information was communicated to officers by dispatch. Officer Grayson testified that he was familiar with the Spencer Housing Projects and had patrolled the area in the past; he testified it is a high-crime area known for assaults, shootings, stabbings, drug trafficking, and recovery of firearms. (TR. 16-17). Officers Grayson and Barnes were on patrol in their marked cruiser on 30th Street and Spencer

Street a couple blocks away from the Spencer Housing Projects when they received the call and arrived at the scene within one minute. (TR. 10-11, 14-16; Ex. 3 - Dispatch Logs; Ex. 4 - Dispatch Audio).

The officers' cruiser was equipped with an audio video recording system that recorded the scene as they arrived at 28th Street and Spencer Street. (TR. 11; Ex. 6 - Mobile Video Recording ("MVR")). The area was a residential street lit by streetlights and appeared largely empty except for a white SUV with a male in the driver's seat and two shirtless black males that had just exited the SUV. Officers exited their cruiser, stated they were responding to a call for shots fired call, and asked if the shirtless individuals had heard shots. Officer Grayson's body camera recorded the audio-visual of this interaction. (Ex. 6 - Body Worn Camera ("BWC") 2242 hrs; TR 11, 17-21). Defendant (the shirtless individual wearing jeans who had exited the passenger side of the SUV) initially denied hearing anything. The other shirtless individual (who had exited the driver's side of the SUV and was wearing black pants) indicated he had heard shots and started pointing north; Defendant quickly changed his original answer and also began pointing north. (Ex. 6 - BWC 2242 hrs, at 42:15-21). Officer Grayson testified that, at this point, he believed Defendant may be armed and dangerous and began approaching Defendant to conduct a pat-down. Officer Barnes approached the other individual to conduct a pat-down. (TR. 21-27).

After seeing Officer Barnes approach the other individual for a pat-down, Defendant quickly turned around and began walking away from Officer Grayson. Defendant pulled on the SUV's door handle and continued to walk towards the back of the SUV. (Ex. 6 - BWC 2242 hrs, at 42:22-30). Officer Grayson testified he became concerned that Defendant was trying to walk out of view where he could pull a weapon. (TR. 27-28). Officer Grayson stated, "Everyone's gonna get patted down" and continued to approach Defendant, who replied that officers "didn't have the right" and kept attempting to avoid being pat-down. Officer Grayson testified, and the body camera video reflects, that Defendant appeared to be protecting his left side by angling it against the SUV. Officer Grayson ordered Defendant to show his hands and again told Defendant he was going to be patted down. Defendant complied with Officer Grayson's command to place his hands on the SUV but continued to verbally protest the officers' actions. Officer Grayson was able to pat-down Defendant's right side. Officer Barnes, having finished his pat-down of the other individual, came to assist Officer Grayson. Defendant continued to protect the left side of his body and appeared to reach toward his left pocket. Officer Grayson testified he believed Defendant may

2

be reaching for a weapon, so Officer Grayson drew his firearm while Officer Barnes handcuffed Defendant. (TR. 29-32; Ex. 6 - BWC 2242 hrs, at 42:31-43:00). Officer Grayson asked Defendant, "What is on you, do you have something on you right now?" (Ex. 6 - BWC 2242 hrs, at 43:05-12).

At this point, a woman approached the officers and began yelling at and arguing with them, (TR. 34-35; Ex. 6 -BWC 2242 hrs, at 43:13-45:40), and soon thereafter other residents and citizens began approaching the officers. Officers called dispatch for backup, and after additional officers began arriving to control the scene, Officer Grayson was able to pat down Defendant's left side. Officer Grayson felt a hard object in Defendant's left pocket that Officer Grayson testified was "immediately apparent" to be a firearm. (Ex. 6 - BWC 2242 hrs at 45:41-52; TR. 39-40). Defendant then become compliant, stepped away from the SUV, and took a knee. Officer Grayson searched Defendant's left pocket and recovered a loaded firearm, (Ex. 6 - BWC 2242 hrs at 46:50-47:05), which Officer Grayson later found was not registered and reported stolen. Officer Grayson arrested Defendant for obstruction. (TR. 40-41). The body camera video reflects that the entire interaction from officers' first contact with Defendant through the recovery of the firearm was approximately five minutes. About ten hours after Defendant was arrested, Detective Friedrichsen interviewed Defendant after he was advised of his *Miranda* rights, and Defendant made incriminating statements. (TR. 59-65).

Defendant filed the instant motion to suppress all evidence and statements obtained as a result of his stop and search of his person on July 16, 2019. Defendant argues that the initial encounter with officers was not consensual, officers did not have reasonable suspicion supporting his initial stop and pat-down, and that his detention exceeded the permissible scope of a *Terry* stop and became an unlawful arrest without probable cause. Therefore, Defendant contends the seizure of the firearm from his person and his subsequent statements made after his arrest were fruit of the Fourth Amendment violations. ([Filing No. 19](); TR. 3, 66-70).[1] The government contends that reasonable suspicion existed justifying a *Terry* pat-down for weapons and that the steps taken by officers were reasonably necessary to achieve the purpose of the stop. ([Filing No. 21 at p. 9](); TR. 71, 73-74).

---

[1] In Defendant's motion he also asserts that OPD officers questioned him without *Miranda* warnings in violation of his Fifth Amendment right against self-incrimination. ([Filing No. 18]()). However, Defendant did not argue the Fifth Amendment violation in his brief ([Filing No. 19]()) and at the hearing defense counsel clarified his position is that Defendant's incriminating statements made during Detective Friedrichsen's interview were fruit of the Fourth Amendment violation, rather than a separate Fifth Amendment *Miranda* violation. (TR. 4-5).

3

## ANALYSIS

Defendant contends that his encounter with officers was not consensual and there was no reasonable, articulable suspicion to justify a *Terry* stop and pat-down. Defendant further asserts his detention exceeded the permissible scope of a *Terry* stop and became a de facto arrest without probable cause. (TR. 3, 67-68).

An officer may stop an individual if the officer has reasonable and articulable suspicion that "criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). In order to justify a stop, a law enforcement officer must be able to "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. Whether reasonable suspicion exists is based on "the totality of the circumstances, in light of the officer's experience." *United States v. Stigler*, 574 F.3d 1008, 1010 (8th Cir. 2009). "Factors that may reasonably lead an experienced officer to investigate include time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence" as well as "a person's temporal and geographic proximity to a crime scene, combined with a matching description of the suspect." *United States v. Quinn*, 812 F.3d 694, 697-98 (8th Cir. 2016)(quoting *United States v. Dawdy*, 46 F.3d 1427, 1429 (8th Cir. 1995); citing *United States v. Juvenile TK*, 134 F.3d 899, 903-04 (8th Cir. 1998)). "After a suspect is lawfully stopped, an officer may conduct a pat-down search for weapons if that officer has a reasonable, articulable suspicion that the suspect is armed and dangerous." *United States v. Houston*, 920 F.3d 1168, 1172 (8th Cir. 2019)(citing *United States v. Trogdon*, 789 F.3d 907, 910 (8th Cir. 2015)).

The undersigned magistrate judge finds that, when considering the totality of the circumstances, law enforcement officers had reasonable suspicion justifying both Defendant's stop and his pat-down. In this case, officers encountered Defendant while responding to a "shots fired" call in a high crime area known for assaults, shootings, stabbings, drug trafficking, and recovery of firearms. Officers arrived at the location provided by dispatch within a minute after receiving dispatch's call. Dispatch informed officers the suspect was a shirtless black male wearing black pants, and only three individuals were readily apparent at the location when officers arrived, including two shirtless black males that generally matched the suspect's description. Although Defendant argues he did not match the suspect's description because he was wearing jeans rather than black pants, given that it was nearly 11:00 p.m. and the residential street was dark and illuminated only by streetlights, officers reasonably could believe any incongruity in pants color

4

was attributable to the poor lighting. Furthermore, given Defendant's proximity to the scene and that officers saw Defendant exit the same SUV as the individual wearing black pants, the latter of which was patted-down by Officer Barnes and released, it would also be reasonable for law enforcement to believe that Defendant possessed a firearm. See *Quinn*, 812 F.3d at 699 ("[G]eneric suspect descriptions and crime-scene proximity can warrant reasonable suspicion where there are few or no other potential suspects in the area who match the description" and may be based on "time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence."). Officer Grayson's suspicions of criminal activity and that Defendant may be armed were further heightened when Defendant initially denied hearing shots but then immediately changed his position to direct officers away from the area. Defendant also quickly turned to walk away from Officer Grayson when Defendant saw Officer Barnes pat-down the other shirtless individual. Officer Grayson testified that it appeared Defendant was attempting to walk out of Officer Grayson's line of sight behind the SUV, and also appeared to be protecting the left side of his body against the SUV, both of which concerned Officer Grayson meant Defendant was attempting to conceal or draw a weapon. See, e.g., *United States v. Dortch*, 868 F.3d 674, 680 (8th Cir. 2017)(finding defendant's response "to the sight of an approaching police officer by actively moving in such a way—pressing the front of his body against the minivan—as to further conceal what, if anything, he had in his coat" contributed to reasonable suspicion). Under these circumstances, the undersigned concludes that Defendant's stop was supported by reasonable suspicion that criminal activity may be afoot, and that his pat-down was supported by reasonable suspicion that he was armed and dangerous.

Defendant further argues that, even assuming reasonable suspicion existed for a *Terry* stop and frisk, the stop turned into a de facto arrest without probable cause when Officer Grayson drew his firearm and handcuffed Defendant. (TR. 67-68, 74).

"As part of a lawful *Terry* stop, officers may take any measures that are 'reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'" *United States v. Smith*, 648 F.3d 654, 659 (8th Cir. 2011) (quoting *United States v. Newell*, 596 F.3d 876, 879 (8th Cir. 2010)). However, "[a] *Terry* stop may turn into an arrest if the stop lasts for an unreasonably long time or if officers use unreasonable force." *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999)(citing *Dunaway v. New York*, 442 U.S. 200, 212 (1979)). "There is no clear line between investigative stops and de facto arrests." *United*

5

*States v. Sanford*, 813 F.3d 708, 712 (8th Cir. 2016)(citing *United States v. Guevara*, 731 F.3d 824, 831 (8th Cir. 2013). During a *Terry* stop, officers must use "the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the *Terry* stop." *Id.* at 713 (quoting *Newell*, 596 F.3d at 879). "[W]hen officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety." *Id.* (quoting *United States v. Fisher*, 364 F.3d 970, 973 (8th Cir. 2004)). When determining "whether [an officer's] actions [meet] the Fourth Amendment's standard of reasonableness, the issue is whether the officer has an objectively reasonable concern for officer safety or suspicion of danger." *Id.* (quoting *Williams v. Decker*, 767 F.3d 734, 740 (8th Cir. 2014)).

Having reviewed the body camera footage and Officer Grayson's testimony, the undersigned magistrate judge concludes that officers' actions were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop, and therefore the *Terry* stop did not turn into a de facto arrest. First, as discussed above, officers were responding to a call of shots fired in a high crime neighborhood close to 11:00 p.m. Officers quickly arrived on the scene after receiving the dispatch call and immediately encountered two individuals that generally matched the suspect's description. Officer Grayson observed Defendant attempt to walk out of sight behind the SUV and angle his left side of his body against the SUV as if to conceal or protect something. Defendant verbally objected and moved his body to thwart Officer Grayson's attempts to conduct the pat-down. Additionally, Officer Grayson's body camera shows that Defendant is a physically large individual compared to the officers, which may also be taken into consideration when assessing reasonableness of police action during a stop. See *Waters v. Madson*, 921 F.3d 725, 738 (8th Cir. 2019)("[T]he video attached to the pleadings shows that [the defendant] is significantly larger than either [police officer], which factors into the applicable circumstances" when assessing the reasonableness of police conduct.). Officer Grayson drew his firearm and Officer Barnes handcuffed Defendant only after Officer Grayson saw Defendant reach towards his left pocket, which is the side Defendant appeared to have been protecting or concealing from officers. Moreover, before Officer Grayson could complete a pat-down of Defendant, the scene around officers quickly escalated. More individuals began surrounding officers and distracted them from their investigation, including a woman that can be seen on Officer Grayson's

body camera talking loudly in close proximity. In consideration of the above, the undersigned concludes that Officer Grayson had an objectively reasonable concern for officer safety or suspicion of danger such that brandishing his weapon and handcuffing Defendant were not more intrusive than necessary to effectuate the purpose of the stop. See, e.g., *Sanford*, 813 F.3d at 713 (finding scope of *Terry* stop was not exceeded where officer brandished his weapon and ordered a defendant out of his vehicle after observing defendant lean forward and obscure an object under the passenger seat); *United States v. Navarrete-Barron*, 192 F.3d 786, 789-91 (8th Cir. 1999)(concluding officers did not exceed scope of *Terry* stop by drawing weapons and handcuffing a potentially armed drug trafficking suspect); *United States v. Lloyd*, 36 F.3d 761, 762-63 (8th Cir. 1994)(finding a valid *Terry* stop was not transformed into an arrest where an officer "looking for men who had just threatened complainant with firearms" brandished his gun and ordered suspect to raise hands); *United States v. Raino*, 980 F.2d 1148, 1150 (8th Cir. 1992)(concluding *Terry* stop did not become a de facto arrest where officers responding to a shots fired call approached a suspect's car with guns drawn). Under the circumstances, the undersigned magistrate judge concludes law enforcement's actions were reasonable to carry out the stop, and therefore did not turn the valid *Terry* stop into a de facto arrest.

Once Officer Grayson was able to control the scene and pat-down Defendant's left side, including the bulge protruding from Defendant's left pant pocket, Officer Grayson felt a hard object on the top half of Defendant's pocket that Officer Grayson testified was immediately apparent to be a firearm. Therefore, Officer Grayson was permitted to seize the object. See *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)(holding that when an officer conducting a pat-down feels an object "whose contour or mass makes its identity immediately apparent" that it is a weapon or contraband, an officer may seize it). After Officer Grayson recovered the firearm from Defendant's person, probable cause existed for his warrantless arrest for, at a minimum, obstruction. See *United States v. Winarske*, 715 F.3d 1063, 1066 (8th Cir. 2013)(citing *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)("A warrantless arrest by law enforcement is reasonable where there is probable cause to believe that someone has committed or is committing a crime."); Neb. Rev. Stat. § 28-901 ("A person commits the offense of obstructing government operations if he intentionally obstructs, impairs, or perverts the administration of law or other governmental functions by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act[.]").

7

Finally, Defendant argues his incriminating statements made during his interview with Detective Freidrichsen were fruit of the Fourth Amendment violation arising out of Defendant's unlawful stop, frisk, and arrest. Having found that Defendant's stop, frisk, and arrest complied with the Fourth Amendment, the undersigned magistrate judge finds Defendant's statements do not need to be suppressed. See *United States v. Cotter*, 701 F.3d 544, 548 (8th Cir. 2012)("Because the *Terry* stop was proper, the district court also did not err in refusing to suppress . . . [the] confession, as it was not the fruit of the poisonous tree.").

Upon consideration,

**IT IS HEREBY RECOMMENDED** to United States District Court Judge Robert F. Rossiter that Defendant's Motion to Suppress (Filing No. 18) be denied.

Dated this 12th day of December, 2019.

BY THE COURT:

s/ Michael D. Nelson
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.